UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**CINDY D. SQUARE**,　　　　　　　　　　　　Case Number : 1:13 CV 541

　　　　Plaintiff,

　　　　　　　　　　　　　　　　　　　　　　Magistrate Judge James R. Knepp, II

　　　　v.

**COMMISSIONER OF SOCIAL SECURITY**,

　　　　Defendant.　　　　　　　　　　　　MEMORANDUM OPINION AND ORDER

## INTRODUCTION

Plaintiff Cindy D. Square seeks judicial review of Defendant Commissioner of Social Security's decision to deny disability insurance benefits ("DIB") and supplemental security income ("SSI"). The district court has jurisdiction under 42 U.S.C. § 405(g) and § 1383(c)(3). The parties have consented to the exercise of jurisdiction by the undersigned in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 13). For the reasons given below, the Court affirms the Commissioner's decision denying benefits.

## PROCEDURAL BACKGROUND

Plaintiff filed applications for DIB and SSI on September 29, 2009. (Tr. 125, 129). Her claims were denied initially and on reconsideration. (Tr. 79, 83, 93). Plaintiff requested a hearing before an administrative law judge ("ALJ"). (Tr. 67). At the hearing, Plaintiff, represented by counsel, and a vocational expert ("VE") testified. (Tr. 29). On September 22, 2011, the ALJ concluded Plaintiff was not disabled. (Tr. 11). Plaintiff filed a request for review. (Tr. 8). Plaintiff's request was denied, making the decision of the ALJ the final decision of the Commissioner. (Tr. 1); 20 C.F.R. §§ 404.955, 404.981, 416.1455, 1481. On January 31, 2013,

Plaintiff filed the instant case. (Doc. 1).

## FACTUAL BACKGROUND

### *Plaintiff's Background, Vocational Experience, and Daily Activities*

Born August 12, 1961, Plaintiff was 47 years old at the time of her alleged disability onset date (June 22, 2009). (Tr. 14, 22). Plaintiff has a high school education and is a certified pharmacy technician. (Tr. 308). Her past relevant work experience includes pharmacy tech, pizza delivery person, pizza baker, bartender, mail carrier, and dishwasher. (Tr. 22, 34, 162).

Plaintiff averred she is unable to work due to constant pain from fibromyalgia all over her body, but mostly in her joints. (Tr. 147, 173-76). She claimed the pain causes fatigue, weakness, shooting pains, numbness, and difficulty walking. (Tr. 173). Plaintiff indicated she could only walk to the end of the driveway, stand for ten-to-fifteen minutes, sit for thirty minutes, and required a "lot" of breaks to complete household chores. (Tr. 206).

Plaintiff lived by herself and managed her own shopping and finances. (Tr. 182, 310). Concerning daily activities, Plaintiff worked on puzzles, watched television, engaged in household chores, napped, took care of two dogs and a cat, engaged in social activities with friends, read, cooked simple meals, maintained a small garden, cleaned, and did laundry. (Tr. 35-38, 183, 185, 211-12, 310). However, elsewhere in the record Plaintiff claimed she could no longer take care of herself, help others, shop, shower, visit, cook, bake, or do yard work. (Tr. 183-84, 205, 209). She claimed she did not drive except to medical appointments and required someone nearby when she showered in case she fell. (Tr. 199, 209). She also indicated her family helped with chores and daily activities. (Tr. 199).

### *Medical Evidence*

Beginning in November 2008, and continuing through July 2009, Plaintiff treated at

Northcoast Family Practice ("Northcoast"). (Tr. 239). During this time, Plaintiff complained of cold and respiratory symptoms (Tr. 237-39, 233-34), joint pain (Tr. 230), injury to her left foot after falling up stairs (Tr. 231), and a cat bite (Tr. 233-34). At each visit, Plaintiff's physical examination was generally unremarkable. (Tr. 230-40). Treatment providers routinely advised Plaintiff to stop smoking and twice indicated Plaintiff did not have back or neck pain. (Tr. 232, 236-38).

Plaintiff first visited Great Lakes Pain Management ("Great Lakes") on June 19, 2009. (Tr. 286). She complained of pain in her joints and knees, which she claimed started in May and progressively worsened. (Tr. 286). Plaintiff's examination was generally normal aside from tenderness in the left knee, painful range of motion in both knees, and a mild antalgic gait. (Tr. 286-89). Emad Mikhail, M.D., diagnosed Plaintiff with localized osteoarthrosis and joint pain. (Tr. 289).

Dr. Mikhail performed two bilateral intra-articular knee steroid injections under fluoroscopic guidance. (Tr. 281, 284-85). At a follow-up visit, Plaintiff reported the pain was worse; and she complained of shooting spasms in her knees and an upset stomach from pain medication. (Tr. 281). On July 14, 2009, Plaintiff said she was doing better because she reduced her activity but complained of feeling nauseas during knee x-rays, which came back normal. (Tr. 278, 293).

Plaintiff continued to treat at Great Lakes through February 2010. Generally, she complained of knee, joint, and body pain. (Tr. 263, 266, 269, 272, 275, 278, 356, 360, 366, 368, 371). However, on July 27, 2009, and August 11, 2009, Plaintiff complained of lumps on her body, left hand, clavicle area, and right lower leg. (Tr. 272, 275). At times, Plaintiff's accompanying symptoms included numbness in her lower arms and feet. (Tr. 264). On January

3

20, 2010, Plaintiff was diagnosed with shingles and complained of burning in the left side of her face. (Tr. 371). Throughout her treatment history, Plaintiff was diagnosed with multiple joint pain, rheumatoid arthritis, osteoarthrosis, fibromyalgia, hand/finger pain, and postherpetic trigeminal neuralgia. (Tr. 265, 269, 271, 277, 280, 358, 362, 366, 373).

At times, Plaintiff reported extremely severe pain that interfered with her sleep and activities of daily living. (Tr. 263, 356). After adding new medication to her regimen on November 24, 2009, Plaintiff said she had a "really good week", but declared the pain returned shortly thereafter. (Tr. 360). On December 23, 2009, Dr. Mikhail indicated Plaintiff was doing "OK" with her current regimen. (Tr. 366).

On November 20, 2009, John Taylor, M.D., completed a medical source questionnaire and diagnosed Plaintiff with "myalgias (perhaps fibromyalgia)". (Tr. 302). Plaintiff described aches and pains "everywhere". (Tr. 302). By way of clinical findings, Dr. Taylor indicated Plaintiff had good grip, but tenderness in all fibromyalgia tender points. (Tr. 302). Regarding Plaintiff's response to prescribed therapy, Dr. Taylor relayed Plaintiff did not attend physical therapy, and claimed she could not exercise and medication did not help. (Tr. 302, 304). Dr. Taylor indicated Plaintiff went up and down stairs twice and walked her dog every day. (Tr. 304). He found no obvious objective clinical abnormalities but noted subjectively, she could not do activities of daily living or simple stretches without pain. (Tr. 304).

On January 20, 2010, Plaintiff underwent a left stellate ganglion block in her left cervical spine under fluoroscopic guidance. (Tr. 375). At a follow-up visit with Great Lakes, Plaintiff complained of pain all over but indicated she experienced some relief in pain around her eye because the shingles had cleared up. (Tr. 377). Plaintiff was recommended for physical therapy

and a combination of therapeutic modalities, such as massage, balance and stair training, and progressive exercise training. (Tr. 369).

On March 29, 2010, Plaintiff reported to the Lake Hospital emergency room ("Lake") for pain and a medication refill. (Tr. 392). Plaintiff's physical examination was unremarkable and the treating physician's clinical impression was chronic pain. (Tr. 393).

On April 8, 2010, Plaintiff returned to Lake complaining of myalgic symptoms which had persisted for the past ten months. (Tr. 386). The treating physician indicated Plaintiff's visit was "purely a case of being out of her medications[]" because Plaintiff was between primary care physicians. (Tr. 387).

Plaintiff presented to The Cleveland Clinic Foundation's Pain Management Center at Euclid Hospital ("Euclid") on April 29, 2010. (Tr. 411). She reported her activities of daily living had decreased and she had trouble sleeping. (Tr. 411). Plaintiff claimed no relief from pain management programs and said injections made the pain worse. (Tr. 411). Exacerbating factors were walking, sitting, driving/riding in the car, entering/exiting a car, mornings, stairs, and walking her dogs a few times per day. (Tr. 407, 411). Alleviating factors were sitting, lying supine, applying heat or cold, and taking medications including muscle relaxants and NSAIDs. (Tr. 407, 411). She continued to treat at Euclid through October, 2010. (Tr. 445). Although she often complained of chronic pain (Tr. 407, 450, 461, 469), she also presented with unrelated complaints of an ankle sprain, sinus symptoms, and chronic dental problems (Tr. 461, 473, 491).

On June 22, 2010, Plaintiff presented to Hillcrest Hospital ("Hillcrest") because she ran out of medication. (Tr. 432-33, 435). An examination revealed back pain but was otherwise unremarkable. (Tr. 433-34). At discharge, she was assessed with fibromyalgia and prescribed Vicodin. (Tr. 440).

5

On July 20, 2010, Plaintiff returned to Hillcrest. (Tr. 421). She said she fell and twisted her left ankle and was assessed with a left ankle sprain. (Tr. 422-24). At discharge, she was provided crutches and a prescription for Motrin. (Tr. 427).

An August 12, 2010 MRI of Plaintiff's spine revealed degenerative changes at the C5-6 level, minimal levorotatory scoliosis of the lumbar spine, and degenerative changes predominantly at the L2-3 and L3-4 levels. (Tr. 457).

On October 12, 2010, Plaintiff returned to Euclid for a follow up visit and medication management. (Tr. 444). She did not have new concerns, other than asking to have a few medications adjusted as her previous medications were no longer available at a reduced price. (Tr. 444). Her physical examination was unremarkable and she was assessed with hypertension, mixed hyperlipidemia, depression, asthma, and hyperglycemia. (Tr. 445).

*State Agency Review*

David Dietz, Ph.D., reviewed Plaintiff's medical records on December 29, 2009, and found Plaintiff was mildly limited in all functional domains except she was moderately limited in her ability to maintain concentration, persistence, or pace. (Tr. 313-330, 323). On July 22, 2010, Darrell Snyder, Ph.D., affirmed Dr. Dietz' findings as written. (Tr. 404-05).

Gary Hinzman, M.D., conducted a physical residual functioning capacity ("RFC") assessment on January 29, 2010, based on his review of Plaintiff's records. (Tr. 341-48). He found Plaintiff could lift or carry 50 pounds occasionally and 25 pounds frequently; stand, walk, or sit for six hours in an eight-hour workday; and was not limited in her ability to push and/or pull. (Tr. 342). Plaintiff could never climb ladders, ropes, or scaffolds; must avoid fumes, odors, dusts, gases, and poor ventilation; and did not exhibit manipulative, visual, or communicative limitations. (Tr. 343-45). On July 9, 2010, Bernard Stevens, M.D., affirmed the RFC as written.

(Tr. 403).

*Consultative Examination*

On December 11, 2009, J. Joseph Konieczny, Ph.D., performed a psychological evaluation. (Tr. 308). Dr. Konieczny found Plaintiff was not impaired in her abilities to concentrate, attend to tasks, understand, follow directions, relate to others, and deal with the general public; and was moderately impaired in her ability to withstand stress and pressure due to depression. (Tr. 310-11). Dr. Konieczny noted Plaintiff was able to work on puzzles, watch television, engage in household chores, manage household shopping and finances, and regularly partake in social activities with friends. (Tr. 310). Dr. Konieczny added Plaintiff participated in cooking, cleaning, and laundry to the extent she was physically capable and "would appear to require assistance in those daily activities that are physically strenuous. She would otherwise seem capable of managing her daily activities and [] handling her financial affairs without assistance." (Tr. 311). He diagnosed depressive disorder. (Tr. 311).

*ALJ Decision*

The ALJ determined Plaintiff suffered from severe impairments including fibromyalgia, degenerative disc disease of the lumbar spine, asthma, and depression. (Tr. 16). Next, the ALJ found Plaintiff had the RFC to perform light work except she required a sit/stand option every hour for about five minutes; could occasionally bend, balance, and climb ramps and stairs; could not kneel or crawl; could handle, finger, feel, and reach in all directions; and must avoid pulmonary irritants in excess of what would be encountered on a typical day. (Tr. 18). Further, Plaintiff was limited to work which involved simple, routine tasks with simple, short instructions and could only make simple work related decisions. (Tr. 18). Moreover, Plaintiff could have few workplace changes and only minimal contact with the public, although she could interact with

coworkers and supervisors. (Tr. 18).

Considering Plaintiff's age, education, work experience, RFC, and VE testimony, the ALJ determined Plaintiff could work as a mail room clerk, merchandise marker, or office helper. (Tr. 22-23). Thus, the ALJ determined Plaintiff was not disabled. (Tr. 23).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for DIB and SSI is predicated on the existence of a disability. 42 U.S.C. § 423(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The

Commissioner follows a five-step evaluation process – found at 20 C.F.R. § 404.1520 – to determine if a claimant is disabled:

1. Was the claimant engaged in a substantial gainful activity?

2. Did the claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's RFC and can she perform past relevant work?

5. Can the claimant do any other work considering her RFC, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in steps one through four. *Walters*, 127 F.3d at 529. The burden then shifts to the Commissioner at step five to establish whether the claimant has the RFC to perform available work in the national economy. *Id.* The court considers the claimant's RFC, age, education, and past work experience to determine if the claimant could perform other work. *Id.* A claimant is only determined to be disabled if she satisfies each element of the analysis, including inability to do other work, and meets the duration requirements. 20 C.F.R. §§ 404.1520(b)-(f); 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff argues the ALJ did not conduct a proper pain and credibility analysis "given the diagnosis of fibromyalgia". (Doc. 17, at 6). Accordingly, review of the ALJ's credibility determination is warranted.

The Sixth Circuit recognizes that pain alone may be disabling. *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984). However, an ALJ is not required to accept a claimant's own testimony

9

regarding her pain. *See Gooch v. Sec'y of Health & Human Servs.*, 833 F.2d 589, 592 (6th Cir. 1987). The regulations establish a two-step process for evaluating pain. *See* 20 C.F.R. § 404.1529; *see also* Social Security Ruling (SSR) 96-7p, 1996 WL 374186. For pain or other subjective complaints to be considered disabling, there must be: 1) objective medical evidence of an underlying medical condition; and 2) objective medical evidence that confirms the severity of the alleged disabling pain, or objectively, the medical condition is of such severity that it can reasonably be expected to produce such disabling pain. *Felisky v. Bowen*, 35 F.3d 1027, 1038 (6th Cir. 1994). This standard does not require "objective evidence of the pain itself." *Duncan v. Sec'y of Health & Human Servs*, 801 F.2d 847, 853 (6th Cir. 1986).

Fibromyalgia is a unique condition "marked by 'chronic diffuse widespread aching and stiffness of muscles and soft tissues.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 244 n.3 (6th Cir. 2007) (quoting *Stedman's Medical Dictionary for the Health Professions and Nursing* at 541 (5th ed. 2005)). Diagnosing fibromyalgia involves "observation of the characteristic tenderness in certain focal points, recognition of hallmark symptoms, and 'systematic' elimination of other diagnoses." *Rogers*, 486 F.3d at 244 (quoting *Preston v. Sec'y of Health & Human Servs.*, 854 F.2d 815, 820 (6th Cir. 1988)). CT scans, x-rays, and minor abnormalities "are not highly relevant in diagnosing [fibromayalgia] or its severity." *Id.*; *see also Preston*, 854 F.2d at 820. "[P]hysical examinations will usually yield normal results – a full range of motion, no joint swelling, as well as normal muscle strength and neurological reactions. There are no objective tests which can conclusively confirm the disease; rather it is a process of diagnosis by exclusion". *Id.* at 818. However, as unique as fibromyalgia may be, it does not carve out an exception to the Social Security Act's mandate that "[a]n individual's statement as to pain or

other symptoms shall not alone be conclusive evidence of disability". 42 U.S.C. § 423(d)(5)(A); To this end, "[t]he mere diagnosis of fibromyalgia, coupled with allegations of disabling subjective limitations, does not, *ipso facto*, require an ultimate finding of disability." *Cooper v. Astrue*, 2010 WL 5557448, at *4 (W.D. Ky. 2010) ().

Rather, the ALJ is to consider certain factors in determining whether a claimant has disabling pain: 1) daily activities; 2) location, duration, frequency, and intensity of pain or symptoms; 3) precipitating and aggravating factors; 4) the type, dosage, effectiveness, and side effects of any medication; 5) treatment, other than medication, to relieve pain; and 6) any measures used to relieve pain. 20 C.F.R. § 404.1529(c)(3); *Felisky*, 35 F.3d at 1039-40. Given the lack of objective tests to confirm the severity of fibromyalgia, these factors play an important role. As the Sixth Circuit has said, "a diagnosis of fibromyalgia does not automatically entitle [a claimant] to disability benefits . . . . Some people may have a severe case of fibromyalgia as to be totally disabled from working but most do not and the question is whether claimant is one of the minority." *Vance v. Comm'r of Soc. Sec.*, 260 F. App'x 801, 806 (6th Cir. 2008) (citing *Rogers*, 486 F.3d 234; *Preston*, 854 F.2d 815).

Ultimately, it is for the ALJ, not the reviewing court, to judge the credibility of a claimant's statements. *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (ALJ's credibility determination accorded "great weight"). "Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997). In reviewing an ALJ's credibility determination, the Court is "limited to evaluating whether or not the ALJ's explanations for partially discrediting [claimant's testimony] are reasonable and

supported by substantial evidence in the record." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). The Court may not "try the case de novo, nor resolve conflicts in evidence". *Gaffney v. Bowen*, 825 F.2d 98, 100 (6th Cir. 1987).

Here, the ALJ determined Plaintiff had the severe impairments of fibromyalgia, degenerative disc disease of the lumbar spine, asthma, and depression. (Tr. 16). Taking into consideration Plaintiff's subjective complaints, the ALJ found her medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, her statements concerning the intensity, persistence, and limiting effects of those symptoms were less than credible to the extent they conflicted with the RFC. (Tr. 19). In reaching this conclusion, the ALJ considered Plaintiff's daily activities; the type, dosage, effectiveness, and side effects of any medication; treatment, other than medication, to relieve pain; and nature and frequency of attempts to obtain medical treatment. *See* 20 C.F.R. § 404.1529(c)(3). Upon review, the ALJ's credibility determination is supported by substantial evidence for each of the reasons stated by the ALJ.

Concerning activities of daily living, the ALJ indicated Plaintiff did some household chores, cooked prepared foods, occasionally did laundry, did limited housework, watched television, read, let the dogs out, and took naps. (Tr. 19, *referring to*, 35-38, 183, 185, 211-12, 310). On the other hand, the ALJ also considered that Plaintiff said her sister and children helped with housework and shopping, she woke up at night in pain, could not drive, and had two to four bad days per week. (Tr. 19, 183-84, 199, 205, 209). Accordingly, the ALJ fairly considered Plaintiff's activities of daily living and found her ability to perform some activities belied her claims that she was unable to perform any work.

Regarding the type, dosage, effectiveness, and side effects of any medication, the ALJ stated Plaintiff's complaints of pain increased despite receiving two steroid injections, a left stellate ganglion nerve block, pain management treatment, and taking Oxycodone or Vicodin. (Tr. 20, *referring to*, *e.g.*, Tr. 281, 302, 304, 360, 375, 411). Despite her claims of extreme pain, Dr. Taylor noted Plaintiff goes up and down stairs twice per day and walks her dog daily. (Tr. 20, *referring to*, Tr. 304). Similarly, at times treatment notes indicated Plaintiff's current medication management was effective and Plaintiff reported no difficulty in activities of daily living. (Tr. 366, 444, 455, 476). Also, contrary to Plaintiff's claims that medication did not reduce her pain, Plaintiff visited the emergency room several times claiming she had run out of medication and asked for a prescription. (Tr. 20-21, *referring to*, Tr. 387, 392, 432). In fact, one treatment note indicated Plaintiff's visit was "purely a case of being out of her medications." (Tr. 387). These visits suggest medication reduced Plaintiff's pain to some degree.

Concerning treatment other than medication to relieve pain, the ALJ considered Plaintiff's exacerbating factors, including standing, walking, driving/riding in a car, entering/exiting a car, mornings, stairs, and carrying things and her alleviating factors, including resting, application of heat and cold, and medications such as muscle relaxants and NSAIDs. (Tr. 20-21, *referring to*, Tr. 407, 411). Not only does this provide further support for the effectiveness of Plaintiff's medication, it also suggests Plaintiff was able to receive some relief from alternative sources.

Addressing the nature and frequency of attempts to obtain medical treatment, the ALJ noted Plaintiff was referred to physical therapy at least three times, but the record did not show she ever followed up on these recommendations. (Tr. 21, *referring to*, Tr. 302, 304, 369, 470).

13

Plaintiff's non-compliance with prescribed treatment is properly considered as part of the ALJ's credibility determination. 20 C.F.R. § 404.1530; *Payne v. Comm'r of Soc. Sec.*, 402 F. App'x 109, 114-15 (6th Cir. 2010).

Finally, the ALJ expressly discredited the opinion of state agency consultant, Dr. Hinzman, because the record supported greater limitations than he accorded and because insufficient consideration was given to the claimant's subjective complaints. (Tr. 21, *referring to*, Tr. 341-48). As expressly stated, the ALJ did not ignore Plaintiff's subjective complaints. Rather, the ALJ afforded considerable weight to the opinions of Drs. Konieczny and Dietz, as they were consistent with the record. (Tr. 21).

Indeed, Dr. Konieczny found Plaintiff had mild psychological impairments, except for her ability to withstand stress and pressure. (Tr. 310-11). He noted Plaintiff was able to work on puzzles, watch television, engage in household chores, manage household shopping and finances, and regularly partake in social activities with friends. (Tr. 310). Dr. Konieczny added Plaintiff participated in cooking, cleaning, and laundry to the extent she was physically capable. (Tr. 310). He noted, "[Plaintiff] would appear to require assistance in those daily activities that are physically strenuous. She would otherwise seem capable of managing her daily activities and of handling her financial affairs without assistance." (Tr. 311). Further, Dr. Dietz found Plaintiff mildly limited in all domains, including activities of daily living and social functioning, except moderately limited in concentration, persistence, or pace. (Tr. 313-30). The ALJ discredited Plaintiff's complaints of debilitating pain based, in part, on these findings regarding her ability to engage in some light work.

Given her fibromyalgia diagnosis, Plaintiff argues the ALJ improperly relied on a lack of objective medical evidence. (Doc. 17, at 7). However, the ALJ does not indicate a lack of objective evidence discredits Plaintiff's complaints of pain regarding fibromyalgia. Furthermore, a lack of objective medical evidence is relevant to Plaintiff's other severe impairments, including degenerative disc disease of the lumbar spine, asthma, and depression. Concerning fibromyalgia, the ALJ considered several of the regulatory factors set forth in 20 C.F.R. § 404.1529(c)(3) to formulate her credibility determination, as explained above. Therefore, the ALJ did not err by finding a lack of objective findings negatively reflected on Plaintiff's credibility.

In short, the record evidence supports the ALJ's credibility determination and RFC assessment, and Plaintiff has not demonstrated she is "one of the minority" for whom fibromyalgia is completely disabling. *Vance*, 260 F. App'x 806.

## CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the Court finds the Commissioner's decision supported by substantial evidence. Therefore, the decision of the Commissioner is affirmed.

IT IS SO ORDERED.

                                                                               s/James R. Knepp II
                                                                               United States Magistrate Judge